**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**

**HATT 65, L.L.C., and FRANK W.
BOYKIN, II, FAMILY TRUST,**

      **Plaintiffs,**

v.                                                       **Case No.: 3:06cv332-MCR/EMT**

**TERRY KREITZBERG; and S/V
"ESCAPE," *in rem*,**

      **Defendants.**
_____/

## ORDER AND FINAL JUDGMENT

This case is before the court for final resolution following a bench trial held from August 24 through August 27, 2009. The plaintiffs, Hatt 65 L.L.C. and Frank W. Boykin, II, Family Trust (collectively "Hatt 65"), filed this admiralty and maritime action against Terry Kreitzberg ("Kreitzberg") and S/V *Escape*, *in rem,* seeking a judgment for damages allegedly caused by the *Escape* during Hurricane Dennis.[1] This court has original jurisdiction over admiralty and maritime cases. *See* U.S. Const. art. III, § 2; 28 U.S.C. § 1333(1).

**Rule 52 Standards**

At trial, following the close of the plaintiffs' evidence, the defendants moved for judgment on partial findings pursuant to Federal Rule of Civil Procedure 52(c), arguing that the plaintiffs had failed to set forth sufficient evidence to engage the legal presumptions of fault that arise under two separate rules of admiralty law, discussed in detail below. Rule 52(c) permits the court during a nonjury trial and after a party has been fully heard on an issue to enter judgment on a claim or defense that "can be maintained or defeated only

---

[1] The case initially also included a first-party claim in count II against Hatt 65's insurer, Great Lakes Reinsurance (UK) PLC. The parties settled that claim and the cause against Great Lakes Reinsurance (UK) was dismissed with prejudice by stipulation of the parties (doc. 173). *See* Fed. R. Civ. P. 41(a)(1).

with a favorable finding on that issue," and any judgment on partial findings must be supported by findings of fact and conclusions of law as required under Rule 52(a). Fed. R. Civ. P. 52(c). When ruling on a Rule 52(c) motion, "the court must weigh the evidence and may consider the witnesses' credibility," treating the motion "as if it were a final adjudication at the end of trial," though it occurs in the middle. *Caro-Galvan v. Curtis Richardson, Inc.*, 993 F.2d 1500, 1504 (11th Cir. 1993) (internal marks omitted). Thus, the court resolves the disputed issues on the basis of the preponderance of the evidence, without drawing any special inferences in favor of the plaintiff. *Emerson Elec. Co. v. Farmer*, 427 F.2d 1082, 1086 (5th Cir. 1970)[2] (discussing the former Rule 41(b)[3]). The court retains discretion under Rule 52(c) to "decline to render any judgment until the close of the evidence," and the court exercised that discretion in this case.

In rendering judgment following a nonjury trial, Rule 52(a) requires the district court to make specific findings of fact and to state its conclusions separately. The rule "does not require a finding on every contention raised by the parties," but requires the court to provide sufficient detail demonstrating that care was taken in ascertaining and analyzing the facts necessary to the decision. *Feazell v. Tropicana Prods., Inc.*, 819 F.2d 1036, 1042 (11th Cir. 1987). In accordance with the requirements of Rule 52, having heard and considered all of the testimony, evidence, and arguments presented, the court now enters the following findings of fact and conclusions of law.

**Findings of Fact**

On July 10, 2005, at 2:27 in the afternoon, the center of the eye of Hurricane Dennis[4] made landfall in northwest Florida approximately eight miles east of Gulf Breeze,

---

[2] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

[3] Case law construing the former Rule 41(b) is equally applicable when construing Rule 52(c). *See* 9C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2573.1, at 253 (3d ed. 2008).

[4] When Dennis made landfall, it was a Category 3 "major" hurricane on the Saffir-Simpson hurricane scale. The National Hurricane Center estimated that its maximum sustained surface wind speed was 121 mph. This is the same force as Hurricane Katrina when she made landfall in Mississippi on August 29, 2005, though Katrina was a larger storm geographically. Kreitzberg's expert meteorologist, Dr. Lee Branscome,

Case No. 3:06cv332-MCR/EMT

Florida. This was farther east than originally predicted, wreaking havoc on even the best-laid hurricane preparation plans of boat owners in Gulf Breeze, a city on a peninsula in Santa Rosa County, Florida. Gulf Breeze lies southeast of the City of Pensacola, across Pensacola Bay. It is connected to Pensacola by the Pensacola Bay Bridge that spans three miles across the bay. South of Gulf Breeze across the intercoastal waters lies Santa Rosa Island, a coastal barrier island that offers some protection to the waters around Gulf Breeze from the force of hurricane winds and waves that originate to the south and southeast in the Gulf of Mexico.

On July 8, 2005, the National Hurricane Center (NHC) issued a hurricane watch that included all areas along the coastline of the Gulf of Mexico from the state line border between Louisiana and Mississippi to the eastern most portion of the Florida Panhandle. The next day the watch was upgraded to a hurricane warning, indicating that hurricane force conditions were expected within 24 hours or less. Early NHC forecasts of the expected path of Hurricane Dennis called for the storm to pass west of Gulf Breeze and make landfall at Mobile Bay, Alabama, a track that would have resulted in winds hitting the Gulf Breeze area from the south and west. If the storm had taken the expected path to Mobile Bay, the waters along the protected northern shores of Gulf Breeze would have experienced little wave action, despite its location to the right of the storm because of the protection afforded by the peninsula's land mass.[5] Also, in that scenario, the greater fetch of the wind blowing north across Pensacola Bay would have driven the biggest waves and destruction away from Gulf Breeze and toward Pensacola.[6]

---

characterized Dennis as "a small, but intense, hurricane." (Def.'s Ex. 18-A, at 1-2.)

[5] Dr. Branscome explained that the surface winds of a hurricane rotate counter clockwise around the center of the storm, usually resulting in greater damage on right side of the hurricane. A coast exposed to the right-hand side of a hurricane ordinarily experiences the greatest destruction from wind and water in the form of both storm surge (the abnormal elevation of sea level from the storm pushing water inland) and larger wave forces.

[6] According to the expert witnesses, "fetch" means the distance across water that wind blows unimpeded. The greater the fetch, the greater the wind and wave forces.

Case No. 3:06cv332-MCR/EMT

On the morning of July 10th, most, if not all, persons in the area were still expecting the storm to make landfall near Mobile Bay to the west in accordance with the NHC's 4:00 a.m. forecast, and storm preparations were consistent with the forecast. At the last minute, however, the storm's actual path unexpectedly took the eye of the storm east of Gulf Breeze. This drove the strongest winds from the western part of the eyewall across Pensacola Bay and toward Gulf Breeze, rotating in from the north and then the northwest.[7] As a result, a four- to five- foot storm surge and three-foot waves pounded into the ordinarily protected waters along the northern edge of Gulf Breeze, including Pensacola Bay and Hoffman Bayou. At 1:45 p.m. on July 10, 2005, the winds from the north area were approaching hurricane force in the Gulf Breeze area. By 2:00 p.m., the winds had reached hurricane force, and they continued from the north, then northwest, until the outer eyewall had passed over the area around 2:30 p.m. At the height of the storm, the sustained winds blowing from the northwest across Pensacola Bay toward Gulf Breeze and straight into Hoffman Bayou were 85 to 90 mph, with peak gusts of 105 mph.

In the aftermath of the storm, on a spit of land in Hoffman Bayou located on the north shore of Gulf Breeze and opening into Pensacola Bay to the northwest, lay two vessels–the *WEJ* and the *Escape*. Hatt 65 owns the *WEJ*, a 1990 65-foot Hatteras convertible sport fisherman vessel, which had been moored in Hoffman Bayou; Kreitzberg owns the *Escape*, a 55-foot Tayana Ketch sailboat, which had been moored outside the mouth of Hoffman Bayou near the Pier One Marina in Pensacola Bay. The storm left them situated at nearly a 45-degree angle, with their bows relatively close to one another but not touching, aside from tangled anchor and mooring lines.

Early on July 10, 2005, the day Hurricane Dennis hit, Frank Boykin, who lives along the north shore of Gulf Breeze on property overlooking Hoffman Bayou, together with the help of some friends, boarded windows at the Boykin residence and then prepared the

---

[7] The eyewall of the storm is that area of rotating wind closest to the calm eye of the storm. The hurricane's strength is gauged by the strength of the winds in the eyewall.

Case No. 3:06cv332-MCR/EMT

*WEJ* for the storm.[8] Boykin, along with Brian Finkbone, Mark Braxton, and Dan Green (friends of Boykin weathering the storm at the Boykin residence) moved the *WEJ* out from its ordinary slip at the dock and turned the *WEJ* to face east, expecting the storm to make landfall to the west, causing the winds to come from the south or east as they had during Hurricane Ivan.[9] They deployed two anchors. The main anchor was dropped to the front and port (left) of the *WEJ*'s temporary mooring site, out in Hoffman Bayou. The *WEJ* then backed into its temporary mooring position, making the anchor line stretch taut at an angle away from the port bow. The other anchor was set on shore. A number of mooring lines of new heavy nylon were tied from the *WEJ* to freestanding pilings on both sides of the *WEJ*, the dock behind the *WEJ*, and a tree on shore. Also secured next to Boykin's dock was a houseboat and a boat lift holding a 36-foot Contender 8 feet out of the water.

Boykin's house faces north toward Hoffman Bayou, overlooking the dock and the boats, which are clearly visible from inside the house. Early in the storm, Boykin and his house guests were able to see across the bayou and into Pensacola Bay from inside the Boykin residence. Finkbone and Braxton had noticed two sailboats out in the bay that appeared to be drifting. At approximately 9:00 in the morning, Finkbone took a photograph which shows one large sailboat, the *Escape*, and one smaller sailboat.[10] They appear in the photograph to be close together, and Braxton said that he observed them hit each other. The photograph was taken with a zoom lens at a distance of approximately 150 yards. Finkbone testified that the larger sailboat had moved 200 yards or so since early morning but that he did not actually see it dragging from its mooring because that would

---

[8] Boykin is the sole beneficial owner of the Frank W. Boykin,II Family Trust, which owns the real property, a dock, boat lifts, equipment and improvements at the site.

[9] Hurricane Ivan caused extensive damage in the Pensacola area in September 2004.

[10] Boykin thought that the wind was around 25 mph at this time, but the winds at the Pensacola Naval Air Base at 9:00 a.m. were 31 mph, with gusts of up to 46 mph, blowing out of the north/northeast. Dr. Lee Branscome testified that the winds would have been higher where the *Escape* was moored because of the wind direction and the fetch. By 10:00 a.m., the wind speed at the Naval Air Base was 32 mph with gusts of 48 mph.

be difficult to detect. Finkbone last saw the *Escape* in the bay at 11:30 a.m.; after that, it was nowhere in sight.

As the storm came on shore in early afternoon, visibility in the bayou was limited. In fact, between 2:00 and 2:30 p.m., there were times when the people inside the Boykin residence could not see the *WEJ* due to whiteout conditions caused by severe wind and rain. When the storm let up, the *WEJ* was gone. Boykin and friends went outside in search of it and found the *WEJ* beached on a spit of neighboring land protruding into Hoffman Bayou and due east of where the *WEJ* had been moored. Finkbone cleared the tangled mooring and anchor lines so Boykin could back the *WEJ* up off the land. Boykin described the main anchor line as being taut and wrapped around the beached sailboat next to the *WEJ*, but admittedly, his main focus was getting the *WEJ* off the land. Boykin said when he later went over to look at the sailboat with the owner of the neighboring property, he saw the anchor line wrapped around the keel of the sailboat. He did not have a clear explanation of how or when it was moved, but the anchor line does not appear in any of the photographs. Finkbone testified that he did not immediately notice whether the lines were entangled with another vessel. He was busy loosening the lines so Boykin could back the boat up. When he went back to salvage the lines after the *WEJ* was returned to its temporary mooring site, he noticed the lines from the *Escape* were over the top of the *WEJ* lines. Boykin believed that the *Escape* had allided with the *WEJ* by crossing its anchor line, pulling the *WEJ* from its mooring, and that the mast and spreader of the *Escape* had made contact with the outrigger antenna on the *WEJ*. Boykin's dock and pilings sustained damage consistent with the storm surge forces and the force (either wind or the *Escape*) that tore the *WEJ* from its temporary mooring. Some pilings were broken off and others were bent at the sand line. The other two boats at Boykin's dock appeared to be unharmed by the storm.

Kreitzberg, an experienced mariner, had purchased the *Escape* in March 2005 and kept it in a slip at the Pier One Marina, located just north of the mouth of Hoffman Bayou. Kreitzberg began his hurricane preparations in May 2005. After inquiring of local mariners about the best mooring to weather a hurricane, he proceeded to construct a hurricane

Case No. 3:06cv332-MCR/EMT

mooring out of concrete, metal rebar, and chain, relying on his knowledge, the practice of local mariners, and the advice of Wayne Wheatley, the owner of the Pier One Marina. Wheatley had told him that his 42-foot catamaran vessel had survived Hurricane Ivan the previous year with a similar mooring sunk into the mud bottom outside the marina at the mouth of Hoffman Bayou.[11] Kreitzberg's concrete mooring weighed approximately 1,000 pounds and was designed in a wedge shape to sink into the mud for added holding power. In June 2005, Kreitzberg placed the mooring next to Wheatley's in Pensacola Bay. Kreitzberg did not obtain a permit for a mooring buoy.

Anticipating a storm path similar to that of Hurricane Ivan, which passed to the west of Pensacola and caused considerable damage on the Pensacola side of the bay, Kreitzberg's mooring appeared to be in a relatively protected spot. Kreitzberg could not take the *Escape* farther east for the storm because the sailboat's main mast was too tall to pass under the Pensacola Bay Bridge that connects Gulf Breeze and Pensacola, and the open path to the west would have taken the *Escape* closer to the forecast path of the hurricane rather than away from it. Kreitzberg therefore moved his sailboat out of the marina to his hurricane mooring in the bay where several other sailboats from the marina were also moored for the storm.[12] Kreitzberg attached the *Escape* to his concrete mooring using a 40-foot rope to make a 20-foot bridle with a rubber tire to absorb the shock. He set a Super Max storm anchor with snubber by dropping it and reversing the engines; the anchor had a holding power of 80,000 pounds; the *Escape* weighed 48,400 pounds.[13] He

---

[11] There was some dispute about whether the bay floor outside the marina was in fact mud or sand. Kreitzberg testified that he had first-hand knowledge of the mud because he had spent three days trying to find his anchor in that mud after it broke off during Hurricane Dennis. When confronted with testimony of Dale Hickman, a dock builder in the area who testified it was a sand bottom, Kreitzberg's reply was that there is sand along the shore line, but not out beyond the marina where these moorings were placed.

[12] Leaving them in a slip at the marina would have exposed both the marina and the sailboats to greater damage.

[13] Although this anchor and chain were not recovered, the court credits Kreitzberg's testimony that he deployed the storm anchor with a snubber. The court finds no reason to doubt the veracity of his testimony. Also, there was objective evidence presented by Joseph Urquhart, marine surveyor, who saw the frayed remains of a broken anchor rope on the windlass. Though he could not say whether an anchor had in fact been attached to it, the court finds this evidence supportive of Kreitzberg's testimony.

Case No. 3:06cv332-MCR/EMT

removed the headsail, tightly furled the main and mizzen sails in their respective furling masts, and stripped the deck of all hardware.  He removed the dodger (the fiberglass protection over the cockpit), the top and vents, and he locked all hatches.  Kreitzberg also attached a line to another nearby mooring as a backup, though he did not know its strength.  By the time it was evident that the storm would pass to the east of Gulf Breeze, bringing the strongest winds from the north and northwest, it was too late for Kreitzberg to alter his plans.

Within a week after Hurricane Dennis, Joseph Urquhart III, an employee of Wager and Associates Marine Surveyors, was sent to survey the *Escape*, which was still aground.  He viewed the *Escape* at that time.  He saw no lines tangled on the keel or rudder of the *Escape*, but he could see the line connected to what turned out to be Kreitzberg's mooring device and a broken rope on the anchor windlass.  Urquhart returned shortly thereafter when the *Escape's* mooring was brought up from the bayou.  At the same time, Boykin's anchor and line were pulled up as well.  The anchor was found in the water with the anchor line running parallel to the spit of land where the *Escape* lay.  Urquhart testified that within his experience, the circumstances indicate that the anchor line was either placed there near shore (which no evidence supports) or it was pulled there by the sail boat that crossed over it; he stated that without question, the sailboat had to pass over the *WEJ*'s anchor line.

Richard J. Schiehl, a certified marine surveyor, surveyed the *WEJ* both before and after the hurricane, and participated in a joint survey after the hurricane with Doug Wager, also a marine surveyor and insurance adjuster.[14]  Schiehl testified that the *WEJ* sustained some damage from the storm due to rubbing on the piling, two surface scratches where it went aground through a fence and other areas of isolated paint failure, a bent toggle on the port side outrigger, a broken port side antenna, and he noted other damage, some

---

[14]  The court ruled that Schiehl was not qualified as an expert on causation, accident reconstruction, dock design, meteorology, and that his own calculations concerning wind load were not based on a reliable methodology, but he was qualified as an expert marine surveyor.

Case No. 3:06cv332-MCR/EMT

preexisting and some having occurred after Hurricane Dennis.[15] Schiehl observed that the mast height of the *Escape* was consistent with a broken antenna on the forward port side of the *WEJ*. Regarding the bent toggle at the base of the port side outrigger, he commented it takes a great deal of force on the outrigger to bend the toggle. Because identical equipment on the starboard side of the *WEJ* had no damage, Schiehl concluded that the *Escape* and the *WEJ* had made some contact on the port side of the *WEJ*. There was no major damage to the deck or super structure of the *WEJ* to indicate contact there.

Kreitzberg presented the expert testimony of Dr. Lee Branscome, meteorologist, who testified concerning the force of wind, waves, and current during a hurricane.[16] He explained the impact of land mass, open water, and water depth on wind force and wave formation, and he reported the official wind speeds on the bay during Hurricane Dennis. According to Dr. Branscome, the eye of Hurricane Dennis made landfall at 2:27 p.m., east of the expected target. At Gulf Breeze, the maximum sustained winds were 85-90 mph with gusts of 105 mph. For 20 to 30 minutes between approximately 2 p.m. and 2:30 p.m., the wind speed at Gulf Breeze was 75 mph and above from the north and northwest. The waves were up to three feet in height and surge water of up to five feet forced into the area, including Hoffman Bayou. Dr. Branscome explained that because of the many small land protrusions into the bayou, there could be destruction in one area and not another, depending on relative position to the entrance of the bayou and the configuration of the surrounding land. He stated that the strongest winds and waves would have come from the bay toward the south and southeast directly into Hoffman Bayou. Overall, the effects of the storm were not as great as if Dennis would have made landfall at Mobile Bay as predicted, but the effects along the north shore of Gulf Breeze and in Hoffman Bayou were

---

[15] For instance, Schiehl testified that a stay wire broken on the port outrigger was preexisting damage and three areas of severe marring occurred in an unrelated incident after Hurricane Dennis.

[16] Dr. Branscome has a Ph.D. in meteorology and is a Certified Consulting Meteorologist for the American Meteorological Society. He is the president of Climatological Consulting Corporation, located in Palm Beach Gardens, Florida, and has taught meteorology and physical oceanography at the University of Miami.

Case No. 3:06cv332-MCR/EMT

worse because the wind, coming as it did from the north and northwest across Pensacola Bay, was unimpeded by land traveling over a great distance.

Thomas Danti, Kreitzberg's expert on standards of prudent seamanship, testified that Kreitzberg's actions in preparing the *Escape* for the storm constituted reasonable seamanship under the circumstances. The concrete mooring itself and the method Kreitzberg used to connect it to the vessel was "totally acceptable." In Danti's opinion, it was important that the weight of the mooring (1,000 pounds) and its wedge shape were designed to work together to permit the mooring to bury itself into the bottom of the bay over time, in turn creating a suction effect that increases the holding power of the mooring. Danti noted that Kreitzberg had placed the hurricane mooring over a month before the storm, giving it time to set, and Danti was of the opinion that because the bay floor at the mooring place was muddy, or at least part mud, this hurricane mooring was well-suited for its intended purpose.[17] Danti testified that the shape and weight of Kreitzberg's mooring was conducive to driving itself into the bottom even if the bay floor was part sand and not all mud. According to Danti, Kreitzberg had complied with accepted practice by placing two anchors, and his preparations of the ship were "textbook." Danti also opined that an alternate location was not a reasonable option due to bridges in the area having low vertical clearance in comparison with the size of the main mast. Also, he noted that it was reasonable seamanship to moor the sailboat on what would be the leeward side (opposite from the direction the wind would come from) to eliminate the fetch. The storm was

---

[17] Plaintiff suggested the bay floor at the place where the *Escape* was moored was made of mostly sand, not mud, and, therefore, the *Escape*'s mooring would not have held as well. Kreitzberg, however, testified from his own personal experience that the *Escape* was moored in a mud bottom. Kreitzberg said he knew this because he encountered a muddy floor when looking for his anchor in the same area after the storm and also because Wheatley had used the same type of mooring to secure his boat in the same area during Hurricane Ivan, and it had worked well. Plaintiffs' counsel asked Danti about the holding power of this type of mooring in hard sand, and he replied that it would depend upon how hard the sand was, acknowledging it would take longer to bury itself in hard sand than in mud. The plaintiff's witness Dale Hickman, a dock builder in the area, testified that the floor of Hoffman Bayou where he recovered Kreitzberg's mooring was sandy, but he did not testify based on personal experience about the conditions at the bottom of the bay outside of Pier One Marina where Kreitzberg dropped his mooring. No expert testimony or geological survey was admitted by the plaintiffs to contradict Kreitzberg's testimony. In light of the fact that this type of mooring had worked well in the same spot during the previous hurricane and Kreitzberg's own personal experience, the court credits Kreitzberg's testimony that the bottom of the bay where he placed his mooring was muddy.

anticipated to bring winds from the south and east, and Danti testified the location of Kreitzberg's mooring would offer the best protection from wind and waves in that scenario. He, therefore, concluded that Kreitzberg had used reasonable care in preparing the *Escape* for Hurricane Dennis.

Further findings that are necessary to and intertwined with the legal questions involved in this case are made and discussed below in connection with the court's conclusions of law.

**Conclusions of Law**

The *Louisiana* Rule

Several well-established principles of admiralty predate the Federal Rules of Evidence and still govern the determination of liability and fault in admiralty cases. *See, e.g.*, *Fischer v. S/Y Neraida*, 508 F.3d 586, 593 (11th Cir. 2007) (comparing the *Oregon* rule, which presumes a moving vessel is at fault if it is moving under its own power and allides with a stationary object, with the *Louisiana* rule which applies the same presumption to a drifting vessel); *Self v. Great Lakes Dredge & Dock Co.*, 832 F.2d 1540, 1555 n.14 (11th Cir. 1987) (discussing the *Pennsylvania* rule and "agree[ing] with the Fifth Circuit that the adoption of the federal rules did not modify the substantive burdens and presumptions long established in federal admiralty law."), *cert. denied*, 486 U.S. 1033 (1988). The *Louisiana* rule creates a rebuttable presumption that where a drifting vessel has allided with a stationary vessel or object, the drifting vessel is at fault.[18] *See The Louisiana*, 70 U.S. (3 Wall.) 164 (1885). This presumption of fault operates to shift the burden of persuasion, not only the burden of production, to the moving vessel. *Fischer*, 508 F.3d at 595. It is born of "the common-sense observation that moving vessels do not usually collide with stationary objects unless the moving vessel is mishandled in some way." *Bunge Corp. v. Freeport Marine Repair, Inc.*, 240 F.3d 919, 923 (11th Cir. 2001). The

---

[18] "An allision occurs when a moving vessel strikes a stationary object such as a dock" or a stationary vessel, whereas "[a] collision occurs when a moving vessel strikes another moving vessel." *Fischer*, 508 F.3d at 589 n.1.

Case No. 3:06cv332-MCR/EMT

presumption operates not only against the vessel, but also against those who participated in its management. *Id.*

As a threshold question, then, the court must decide whether there was an allision between the *Escape* and the *WEJ* while the *WEJ* was moored. It was the plaintiffs' burden to establish a prima facie case of an allision. There is no question that the *Escape* was adrift. It had been moored at the mouth of Hoffman Bayou and ended up aground on a spit of land inside Hoffman Bayou. Also, the court finds that the *WEJ* and its anchor-line were stationary. The *WEJ* was well-anchored and moored with new line to several pilings, the dock, and a tree on shore. The last it was seen during the storm's intermittent whiteout conditions, it was still securely moored in its temporary position located just east of Boykin's dock. The court also notes that some damage, such as the pilings bent at the sand level, and the lack of damage to other nearby vessels are consistent with a sudden impact or pull on the *WEJ*. Although no one witnessed the allision, and despite Kreitzberg's contention that there is equal evidence indicating that the wind pushed the *WEJ* out of its moorings, the court finds that the greater weight of the evidence supports a finding that the *WEJ* was stationary until pulled out of its mooring.

Regarding the allision, the court concludes the relative position of the *WEJ*'s anchor line to the path necessarily followed by the *Escape*, given the wind and wave conditions, indicates that the *Escape* would have had to cross the *WEJ*'s anchor line to run aground where it did.[19] Boykin testified that when he went to move the *WEJ* after the storm, the anchor line led to the *Escape* and he later saw the line tangled around the keel of the *Escape*. Finkbone testified that he saw the lines of the *Escape* entangled with and over the top of the *WEJ*'s anchor line when he retrieved the lines after the storm. The only other damage indicating that the boats contacted one another physically was some minimal damage to the *WEJ*'s port-side antenna and a port-side bent outrigger toggle with no corresponding damage on the starboard side. The court finds by a preponderance of the

---

[19] Defense witness Urquhart testified to this explicitly, but even considering only the plaintiffs' evidence, the court would make the same finding.

evidence that an allision occurred between a drifting vessel, the *Escape*, and a stationary object, the anchor line of the moored *WEJ*.

The court also concludes that allision with a stationary anchor line, caused by a drifting vessel, is sufficient to invoke the *Louisiana* rule. "It is well established that there is a presumption of fault against a moving vessel that strikes a stationary object, such as a dock or navigational aid." *Bunge Corp. v. M/V Furness Bridge*, 558 F.2d 790, 794 (5th Cir. 1977),[20] *cert. denied*, 435 U.S. 924 (1978). The court concludes that a navigational aid and a stationary anchor line are sufficiently similar to invoke the presumption in this case.[21] Therefore, Kreitzberg and the *Escape* are presumed at fault for the damage from the allision, unless they can rebut the presumption, as explained below.

The owner of the drifting vessel may rebut the presumption of fault that arises under the *Louisiana* rule by a preponderance of evidence in support of one of the following defenses: (1) "that the allision was the fault of the stationary object;" (2) "that the moving vessel acted with reasonable care;" or (3) "that the allision was an unavoidable accident." *Fischer*, 508 F.3d at 593; *Bunge Corp.*, 240 F.3d at 923. Each defense is independent and sufficient on its own, if sustained, to defeat liability. *Fischer*, 508 F.3d at 593. The first defense is not applicable here because Kreitzberg has not argued that Boykin was negligent in the construction or placement of his dock or anchor or that the *WEJ*'s temporary mooring site for the storm was the cause of the allision. Instead, Kreitzberg

---

[20] *See Bonner*, 661 F.2d at 1209.

[21] The court located one case in which the Fifth Circuit held that the presumption did not arise in the circumstance of an allision with sunken or hidden objects, such as a submerged buoy that was not visible. *See Delta Transload, Inc. v. MV Navios Commander*, 818 F.2d 445, 450 (5th Cir. 1987). The court finds *Delta Transload* distinguishable because it involved the application of the *Oregon* rule in which the moving vessel is not adrift but moving under its own power. *Id.* at 449 & n.7. In that circumstance, the court refused to presume fault or negligence on the part of those operating the vessel because the object was not visible to them. Accepting that the presumptions that arise under the *Oregon* rule and the *Louisiana* rule ordinarily operate the same, *see Fischer*, 508 F.3d at 593, the court nevertheless concludes that this case presents an exception, because whether the stationary object is visible or not visible makes no difference to a drifting vessel. Fault, if any, lies with the person charged with securing the vessel. Accordingly, the court concludes that the *WEJ*'s stationary anchor line is sufficiently analogous to a stationary navigational aid to raise the presumption that arises from the *Louisiana* rule, regardless of the fact that the anchor line was likely submerged.

Case No. 3:06cv332-MCR/EMT

argues that, consistent with the second defense, he exercised reasonable care in preparing the *Escape* for the hurricane, or consistent with the third defense, the accident was unavoidable due to Hurricane Dennis.

The general standard of care in admiralty is based upon "(1) general concepts of prudent seamanship and reasonable care; (2) statutory and regulatory rules; and (3) recognized customs and usages." *Fischer*, 508 F.3d at 594 (internal marks omitted). This is commonly understood "to be reasonable care under the circumstances, and not a higher standard." *Id.* (citing *The Grace Girdler*, 74 U.S. (7 Wall.) 196, 203 (1868)). When preparing a vessel before a hurricane, "reasonable care amounts to whether the owner used all reasonable means and took proper action to guard against, prevent or mitigate the dangers posed by the hurricane." *Id.* (internal marks omitted). Again, the Eleventh Circuit recently emphasized that this is not a "'highest degree of caution' standard." *Id.*

Kreitzberg's expert, Thomas Danti, testified that Kreitzberg's actions in preparation for the storm amounted to reasonable care consistent with prudent seamanship. In Danti's opinion, Kreitzberg's preparations were reasonable and "textbook"–he used two anchors (the homemade mooring and a storm anchor), furled all sails, removed exposed hardware and closed all hatches. Danti testified that the quality and design of the homemade hurricane mooring were well-suited to the situation and that Kreitzberg had properly attached it to the sailboat using a bridle and tire. He indicated that there were no reasonable alternative mooring locations in the area in light of the size of the vessel, the surrounding bridges and geography, and the fact that the weather reports anticipated the storm making landfall west of Gulf Breeze.

Hatt 65 presented no expert testimony to contradict Danti regarding the standard of care that Kreitzberg should have followed, the reasonableness of Kreitzberg's hurricane preparations, or the appropriateness of the homemade mooring system for this vessel or location. Hatt 65 responded only that Kreitzberg's negligence was obvious because witnesses had observed the *Escape* dragging its mooring early in the morning of July 10th, well before the storm was raging. This is a *res ipsa loquitur*-type assertion. In the Eleventh Circuit, "[a] finding of negligence based on the doctrine of *res ipsa loquitur* in the admiralty

context is not totally unique but neither is it routine." *United States v. Baycon Indus., Inc.*, 804 F.2d 630, 632-33 (11th Cir. 1986) (affirming use of the doctrine to find shipowner negligent in the context of a sunken dredge); *see Fischer*, 508 F.3d at 593 (stating the admiralty presumptions are similar to the doctrine of *res ipsa loquitur*). When the Eleventh Circuit found it appropriate to use *res ipsa loquitur*, however, it did not use the doctrine to displace the admiralty presumptions or to add yet another layer of presumption to them. Instead, the court in *Baycon Industries* applied *res ipsa loquitur* in a situation that did not involve an allision but a dredge that sunk in clear weather and calm seas, and therefore, it was a case where the ordinary admiralty presumptions that arise from allisions and collisions were inapplicable. *Baycon Indus.*, 804 F.2d 630, 632-33. The court held it was permissible to infer through the doctrine of *res ipsa loquitur* that the owners who had control of the vessel were negligent, and the burden of rebutting the inference shifted to them. *Id.* at 634. But where, as here, "the admiralty rules govern the allocation of burdens, th[e] theory [of *res ipsa loquitur*] is inapplicable." *Hood v. Knappton Corp., Inc.*, 986 F.2d 329, 332 n.3 (9th Cir. 1993).

Applying the *Louisiana* rule, after Kreitzberg demonstrated the reasonableness of his conduct through uncontradicted expert testimony, successfully rebutting the presumption, Hatt 65 had to do more than assert *res ipsa loquitur* to prevail. The court will not impose another inference based solely upon the fact that Kreitzberg's preparations, though reasonable, ultimately failed to prevent the accident, especially in the absence of conflicting expert testimony. The court finds from the evidence that Kreitzberg exercised reasonable care consistent with prudent seamanship in securing the *Escape* prior to Hurricane Dennis; thus, Kreitzberg is not liable to Hatt 65 for the damage to the *WEJ* and the Boykin dock.

Kreitzberg's successful defense of reasonable care makes it unnecessary to address his alternate defense that the accident was unavoidable due to Hurricane

Dennis.[22] However, if it were necessary to reach this question, the result would be the same. The unavoidable accident defense, if supported by the evidence, rebuts causation by establishing a superceding cause of the accident. *Fischer*, 508 F.3d at 593. A drifting vessel is not liable for the damage resulting from "'an inevitable accident, or a *vis major*, which human skill and precaution could not have prevented.'" *Bunge Corp.*, 240 F.3d at (quoting *The Louisiana*, 70 U.S. at 173).

The court finds that despite Kreitzberg's reasonable actions, the *Escape* dragged its mooring and became a drifting vessel under the force of the wind, waves, and storm surge of Hurricane Dennis, a major hurricane, causing it to end up beached inside Hoffman Bayou. The storm predictions in this case turned out to be slightly inaccurate from a geographical standpoint – but enough so that the *Escape* found itself in an exposed and vulnerable position relative to the storm's strong north and northwest winds as the eyewall rotated toward it. While this was a reasonable spot in which to moor the *Escape* when the hurricane was expected to make landfall to the west of Gulf Breeze, it proved to be the worst possible spot for the unanticipated actual storm path.[23] Unfortunately and unavoidably, by the time it was foreseeable that the storm would make landfall to the east of Gulf Breeze, there was nothing further that Kreitzberg could do to avert this accident.

---

[22] The Eleventh Circuit has noted:

> As a practical matter of proof, the two defenses [i.e., reasonable care and unavoidable accident] will often rely on the same evidence because it may be difficult to persuade the fact-finder that a storm was so fierce as to make an accident inevitable without first demonstrating that the defendant did everything in his power to prevent the accident. But as a doctrinal matter, asserting that the defendant took reasonable care does not require the proof that even supra-reasonable care would not have prevented the accident.

*Fischer*, 508 F.3d at 596.

[23] Dr. Branscome testified that because of the storm's actual path, the wind traveling over three miles of water across the bay toward the location of Kreitzberg's mooring was a powerful force, producing three-foot waves and a storm surge of approximately five feet. He testified that if the storm had tracked west toward Mobile Bay as forecast, the winds would have been significantly reduced due to the geographic protection to the south, and thus there would have been minimal fetch and, in turn, little to no wave action at that location. Danti emphasized that sometimes the only adequate hurricane protection would be a crystal ball.

Case No. 3:06cv332-MCR/EMT

This court's conclusion is not precluded by the holding in *Bunge Corp.*, where the Eleventh Circuit affirmed the district court's finding that Hurricane Opal, also a category 3 hurricane with sustained winds between 85 and 103 mph, was not a *vis major* such that no reasonable preparations would have prevented the ship from breaking its mooring. *Bunge Corp.*, 240 F.3d at 926. In *Bunge Corp.*, the storm had intensified as it raced toward land, but there was no evidence that it changed course from what had been expected or anticipated, as in this case. The defendant's own expert in that case testified that the moorings should have held under sustained winds of 115 mph for that particular vessel, and there was insufficient evidence that the vessel had been subjected to sustained winds in excess of 115 mph. The district court stated that it "[wa]s unable to find that the reasonableness of the precautions taken under the circumstances as known or reasonably to be anticipated were adequate." *Bunge Corp. v. Freeport Marine Repair, Inc.*, No. 3:97cv240, slip op. at 7-8 (N.D. Fla. 1999). Here, by contrast, Kreitzberg's expert testified that his mooring devise and hurricane preparations were reasonable for the anticipated circumstances.[24] The storm's unexpected, last-minute change of course made the accident unavoidable.

The *Pennsylvania* Rule

Hatt 65 also sought to invoke the *Pennsylvania* rule. *See The Pennsylvania*, 86 U.S. (19 Wall.) 125, 136 (1873). This admiralty rule ordinarily shifts the burden of proof from the moving vessel (presumed to be negligent) "to the stationary vessel when the stationary vessel is in violation of a statutory rule intended to prevent accidents." *Sunderland Marine Mut. Ins. Co. v. Weeks Marine Constr. Co.*, 338 F.3d 1276, 1279 (11th Cir. 2003). The stationary vessel then bears the burden of proving that its violation "could not have been a contributory cause of the allision." *Id.* This rule does not allocate liability but determines who bears the burden of proof, *id.*, and places that burden on the party who violated a statute or rule intended to prevent collisions, *Self Towing, Inc. v. Brown Marine Servs., Inc.*, 837 F.2d 1501, 1503 & n.2 (11th Cir. 1988). Hatt 65 asserts that Kreitzberg

---

[24] Again, this testimony was undisputed.

was at fault due to his failure to obtain a permit before sinking his homemade mooring. For the reasons that follow, Hatt 65's argument fails because it has not shown that the rule requiring this permit was intended to prevent accidents of the type involved in this case.

Hatt 65 asserts that Kreitzberg violated Florida statutes and administrative rules that require a permit before placing a mooring buoy or a mooring marker. *See, e.g.*, Fla. Stat. ch. § 327.40(b)(1) (stating no person shall place any safety or navigation markers without a state permit); Fla. Admin. Code Ann. §§ 68D-23.103(1)(d) (defining "mooring buoy" as a device permanently secured to the bottom and to which a vessel may be secured); 68D-23.104 (requiring a permit for placement of markers). Hatt 65 relies heavily on Fla. Admin. Code Ann. § 68D-23.108(8), which states, in part, that a mooring buoy "must be attached to the waterbody bottom using anchors . . . that are of sufficient size, strength and holding power for their intended purpose." While Hatt 65 represented to the court that this language is found in the 2001 version of the Florida Administrative Code, it did not provide the court a copy of it, and in any event, the court's research indicates that this provision (subsection 8) was not in existence until 2006, so it would not have applied in 2005, even assuming it reads as Hatt 65 suggests.[25]

In general, the rules cited by Hatt 65 require a permit for the placement mooring buoys and markers and reference navigational safety in general. However, there is no indication, either in the rules or statutes cited by Hatt 65, or in any testimony provided, of the purpose of the permit requirement, aside from general references to navigational safety which seem to apply to the markers. The fact that there was no clearly marked or permitted mooring buoy was not the cause of the accident here. Whether a properly permitted mooring buoy would have been different in size or shape and therefore would have kept the *Escape* from going adrift during Hurricane Dennis is unknown because there has been no evidence about what physical specifications of a mooring are required either to obtain the permit or for the mooring to be adequate to its intended purpose under the rules. There is simply no evidence from which the court can conclude that Kreitzberg's

---

[25] Although Westlaw dates back only to 2002 for the Florida Administrative Code, subsection 8 is not found in the versions from 2002 through 2005; it first appears in 2006.

Case No. 3:06cv332-MCR/EMT

mooring would or would not have been permitted based on its construction or that such a permit was intended to prevent drifting, as opposed to ensuring that boats are moored in a safe place or that hidden obstacles in the waterway are visible. Under the *Pennsylvania* rule, "fault which produces liability must be a contributory and proximate cause of the collision, and not merely fault in the abstract." *Bd. of Comm'rs of Port of New Orleans v. M/V Farmsum*, 574 F.2d 289, 297 (5th Cir. 1978). Thus, even assuming that the permit rule was intended to prevent accidents generally, there is no showing that it would have prevented the type of accident that occurred in this case.

**Conclusion**

Based on the foregoing, the court finds in favor of the defendants and against the plaintiffs. Accordingly, final judgment is entered in favor of defendants and against plaintiffs, who shall take nothing on their claim. The clerk is directed to tax costs against the plaintiffs.

**DONE and ORDERED** this 30th day of September, 2009.

s/ *M. Casey Rodgers*
**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**